IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) LESLIE BROWN, individually; <br> (2) LESLIE BROWN, parent and next friend of H.B., a minor child; and <br> (3) LESLIE BROWN, on behalf of all other putative plaintiffs, similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> (1) BOB MOORE AUTO GROUP, L.L.C., a domestic limited liability company; <br> (2) BMAG LUXURY 1, L.L.C., a domestic limited liability company; <br> (3) JOZEF DAREN DABROWSKI; <br> (4) TONY G. GRISSOM, individually and acting in his official capacity as an agent of Bob Moore Auto Group, L.L.C. and BMAG Luxury 1, L.L.C.; <br> (5) JOHN DOE TOWING SERVICES; <br> (6) JOHN DOE TOW TRUCK DRIVER #1; and <br> (7) JOHN DOE TOW TRUCK DRIVER #2, <br><br> Defendants. | Case No. CIV-19-409-R |

## **ORDER**

Before this Court is the Motion to Stay and Compel Arbitration filed by Defendants Bob Moore Auto Group, L.L.C. ("BMAG"); BMAG Luxury 1, L.L.C. ("BMAG Luxury"); and Jozef Daren Dabrowski (collectively, "Defendants" or "Bob Moore Defendants"). *See*

Doc. 7. Defendants move to stay this action and compel all claims asserted by Plaintiffs[1] against them to bilateral arbitration. *See id*. at 1–2. The matter is fully briefed and at issue. *See* Docs. 7, 9–10. Having considered the parties' filings, the Court finds as follows.

I.      **Background**

This dispute began with a car sale. Plaintiff Leslie Brown alleges that she purchased a 2010 Audi Q5 SUV for her minor daughter, H.B., from a Bob Moore auto dealership on or about September 27, 2018. *See* Doc. 1, at 4; Doc. 7, at 2, 4. According to Ms. Brown, she signed paperwork effectuating the vehicle's purchase; left $7,000 in cash as a down payment with Defendant Dabrowski, a dealership employee; and drove the vehicle home to give to her daughter. *See* Doc. 1, at 4. The Bob Moore Defendants recall events differently: in their telling, Ms. Brown feigned forgetting her checkbook, assured Mr. Dabrowski that she would return the next morning with down payment money, and left with the vehicle. *See* Doc. 7, at 2–3. The next day, a back-and-forth between Ms. Brown and the dealership ensued over whether she had, in fact, paid the down payment. *See* Doc. 1, at 4–5; Doc. 7, at 2–3. Eventually, on November 1, 2018, Ms. Brown returned the vehicle to the dealership—though not before Defendants unsuccessfully attempted to repossess it. *See* Doc. 1, at 6–7; *see also* Doc. 7, at 3 & n.2. Based on these events, Plaintiffs filed this suit on May 3, 2019, asserting claims for conversion, embezzlement, fraud, conspiracy to commit fraud, theft, breach of the peace, false imprisonment, intentional infliction of

---

[1] Leslie Brown asserts claims against the Bob Moore Defendants in three capacities: (1) individually; (2) as parent and next friend of H.B., her minor daughter; and (3) on behalf of all other putative plaintiffs, similarly situated.

emotional distress, and violations of the Fair Debt Collection Practices Act and the Oklahoma Consumer Protection Act. *See id*. at 7–18.

At issue now is whether this Court is the appropriate forum in which to adjudicate Plaintiffs' claims. Defendants argue that, as part of the vehicle sale, Leslie Brown signed an Agreement to Arbitrate. *See* Doc. 7, at 4–5; *see also* Docs. 7-1, 7-2.[2] This arbitration agreement states, in relevant part:

> By entering into this Agreement to Arbitrate . . ., Customer(s) and Dealership, including any Assignee (collectively referred to as "The Parties") agree, except as otherwise provided in this Agreement, to settle by binding arbitration any dispute between them regarding: (1) the purchase/lease by Customer(s) of the above-referenced Vehicle; (2) any products and services purchased in conjunction with the Vehicle; (3) any financing obtained in connection with the transaction; and/or (4) any dispute with respect to the existence, scope or validity of this Agreement. Matters that the Parties agree to arbitrate include, but are not limited to, disputes related to the Retail Purchase/Retail Lease Agreement and any documents incorporated therein by reference (whether such reference is made in the Agreement or in the document itself), the application for and terms of financing for the transaction, the Finance/Lease Contract, any alleged promises, representations and/or warranties made to or relied upon by the Parties, and any alleged unfair, deceptive, or unconscionable acts or practices.

Doc. 7-2, at 1. The agreement also states that "the Parties agree that by entering into this Agreement, they are waiving their right to a jury trial and their right to bring or participate in any class action or multi-plaintiff action in court or through arbitration." *Id*. Based on this agreement, Defendants contend that all of Plaintiffs' claims are subject to arbitration. *See generally* Docs. 7, 10. Ms. Brown, unsurprisingly, disagrees, launching myriad attacks on the arbitration agreement and Defendants' power to enforce it. *See generally* Doc. 9.

---

[2] The Agreement to Arbitrate, by its own terms, is "incorporated by reference into the Retail Purchase/Retail Lease Agreement." Doc. 7-2, at 1 (capitalization omitted).

3

## II. Standard of Review

The parties agree, and the contract evinces, that this dispute is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. "The FAA applies to all arbitration agreements 'involving commerce,' and creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within coverage of the Act." *Comanche Indian Tribe of Okla. v. 49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004) (internal quotation marks, citations, and brackets omitted). "[E]stablish[ing] a liberal federal policy favoring arbitration agreements," *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018), the FAA "reflects the fundamental principle that arbitration is a matter of contract," "places arbitration agreements on an equal footing with other contacts," and "requires courts to enforce [such agreements] according to their terms." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67–68 (2010) (citations omitted). Under the FAA, "[d]isputes are subject to arbitration when a valid and enforceable arbitration agreement exists, and when the dispute falls within the scope of . . . the arbitration agreement." *Frazier v. W. Union Co.*, 377 F. Supp. 3d. 1248, 1257 (D. Colo. 2019).

Section 2, "the primary substantive provision" of the FAA, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), provides in pertinent part that

> [a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. To "implement § 2's substantive rule . . . ., a party may apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an

agreement in writing for such arbitration,'" and "a party 'aggrieved' by the failure of another party 'to arbitrate under a written agreement for arbitration' may petition a federal court 'for an order directing that such arbitration proceed in the manner provided for in such agreement.'" *Rent-A-Center,* 561 U.S. at 68 (quoting 9 U.S.C. §§ 3–4); *see also Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1280 (10th Cir. 2017). Once the Court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," it "shall . . . order . . . the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

While "the presence of an arbitration [agreement] generally creates a presumption in favor of arbitration, this presumption disappears when the parties dispute the existence of a valid arbitration agreement." *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 613 (10th Cir. 2014) (internal quotation marks and citations omitted); *see also Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) ("[W]hen the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."). Thus, before a court may consider an arbitration agreement's terms, "a threshold matter . . . must be established": the "existence of an agreement to arbitrate." *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir.1997). After all, if a party has not agreed to arbitrate a dispute, she cannot be forced to do so. *See Dish Network, L.L.C. v. Ray*, 900 F.3d 1240, 1243 (10th Cir. 2018). Section 4 of the FAA "requires judicial resolution of issues that go to the 'making' of an agreement for arbitration," and the Court may "compel arbitration of a particular dispute" only when it is "satisfied that the 'making' of the agreement to arbitrate is not at issue" *Spahr v. Secco*,

5

330 F.3d 1266, 1269–70 (10th Cir. 2003) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403–04 (1967)). The Court looks to state law principles of contract formation to determine whether an agreement to arbitrate exists in the first place. *See Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 979 (10th Cir. 2014).

Once the Court finds that an arbitration agreement exists, it *ordinarily* must address the question of arbitrability, that is, "whether the parties have submitted a particular dispute to arbitration." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). But just as parties may agree to arbitrate the merits of disputes, so too can they agree to delegate this arbitrability question. *See Belnap*, 844 F.3d at 1280 (citing *First Options of Chi., Inc. v. Kaplan*, 512 U.S. 938, 943 (1995)). Delegation clauses in arbitration agreements reflect the parties' agreement to "arbitrate threshold issues concerning the arbitration agreement" and "'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center*, 561 U.S. at 68–69; *see also Belnap*, 844 F.3d at 1280 ("[W]hen parties agree that an arbitrator should decide arbitrability, they delegate to an arbitrator all threshold questions concerning arbitrability . . . ."). Such clauses are "simply . . . additional, antecedent agreement[s] the party seeking arbitration asks the federal court to enforce, and the FAA operates on th[ese] additional arbitration agreement[s] just as it does on any other." *Rent-A-Center*, 561 U.S. at 70.

Arbitrability questions "encompass two types of disputes: (1) disputes about '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'; and (2) threshold disputes about '*who should have the*

6

*primary power to decide'* whether a dispute is arbitrable.'" *Belnap*, 844 F.3d at 1280 (emphasis original) (quoting *Kaplan*, 514 U.S. at 942, 944–45). In resolving the first type of dispute, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25. But in resolving the second type, "courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Belnap*, 844 F.3d at 1281 (brackets, internal quotation marks, and citations omitted). "[C]ourts must address the second type of dispute first." *Id.*; *see also id.* at 1287 ("[W]e have repeatedly stated that courts reviewing arbitrability claims must first ask *who* should decide arbitrability, and suggested that only if the parties did *not* delegate questions of arbitrability to an arbitrator may courts reach the merits of arbitrability questions themselves.").

Here, Plaintiffs challenge, among other things, the existence of an agreement to arbitrate. Conversely, the Bob Moore Defendants argue that an arbitration agreement exists *and* that it contains a broad delegation clause. When faced with such competing arguments, the Fifth Circuit has neatly summarized a court's analytical process:

> Enforcement of an arbitration agreement involves two analytical steps. The first is contract formation—whether the parties entered into *any arbitration agreement at all*. The second involves contract interpretation to determine whether *this* claim is covered by the arbitration agreement. Ordinarily both steps are questions for the court. But where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes. . . . [A] valid delegation clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues. Thus, if the party seeking arbitration points to a purported delegation clause, the court's analysis is limited. It performs the first step—an analysis of contract formation—as it always does. But the only question, after finding that there is in fact a valid agreement, is whether the purported delegation clause is in fact a delegation

7

clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated. If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases.

*Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201–02 (5th Cir. 2016) (emphasis original) (citations and paragraph breaks omitted). Thus, "[i]f there is an agreement to arbitrate with a delegation clause," the Court "will consider that clause to be valid and compel arbitration" unless Plaintiffs "challenge . . . the delegation clause itself." *Edwards v. Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018); *see also Frazier*, 377 F. Supp. 3d at 1257 ("In ruling on a motion to stay pending arbitration, a federal court may consider 'only issues relating to the making and performance of an agreement to arbitrate.'" (quoting *Prima Paint Corp.*, 388 U.S. at 404).

With these principles in mind, the Court now turns to its analysis.

## III. Discussion

Plaintiffs argue, broadly, that (1) no arbitration agreement exists; (2) BMAG and BMAG Luxury 1 are not parties to the contract and, therefore, cannot enforce it; (3) H.B. is not a party to the contract and, therefore, cannot be compelled to arbitrate her claims; and (4) the arbitration agreement is unenforceable for a host of reasons. *See generally* Doc. 9.[3] Defendants, on the other hand, argue that Plaintiffs' claims are subject to arbitration and that Leslie Brown has waived her right to bring claims on behalf of a putative class.

---

[3] It bears mentioning that Plaintiffs' objections to Defendants' motion, while legion, are frustratingly—and veering towards unacceptably—underdeveloped. Over thirty-eight numbered paragraphs, Plaintiffs dart between conclusory (and, at times, contradictory) arguments, sprinkling in case citations of varying utility. Such cursory briefing makes it difficult for the Court to fully consider Plaintiffs' contentions.

*See generally* Docs. 7, 10. The Court begins with Plaintiffs' first three arguments, which question contract formation.

(A) The Arbitration Agreement's Existence and Signatories

The Court starts with Plaintiffs' challenge to the making and existence of the arbitration agreement itself. When parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement. *Avedon Eng'g,* 126 F.3d at 1283. But "[w]hen it is apparent from a quick look at the case that no material disputes of fact exist," *Howard*, 748 F.3d at 978, the Court "may decide the arbitration question as a matter of law through motions practice," "viewing the facts in the light most favorable to the party opposing arbitration," and "giv[ing] the party opposing arbitration the benefit of all reasonable doubts and inferences that may arise." *BOSC, Inc. v. Bd. of Cty. Comm'rs of Cty. of Bernalillo*, 853 F.3d 1165, 1177 (10th Cir. 2017) (internal quotation marks and citations omitted). In these circumstances, the Court's analytical framework "look[s] a lot like summary judgment." *Howard*, 748 F.3d at 978; *see also Bellman*, 563 F. App'x at 612 ("[W]hen it's clear no material disputes of fact exist and only legal questions remain . . . a court [may] resolve the arbitration question by ruling on a motion to compel, rather than conducting a summary trial." (internal quotation marks and citation omitted)). Thus, "the party moving to compel arbitration bears the initial burden of presenting evidence sufficient to demonstrate the existence of an enforceable agreement and the opposing party's failure, neglect, or refusal to arbitrate; if it does so, the burden shifts to the

nonmoving party to raise a genuine dispute of material fact regarding the existence of an agreement or the failure to comply therewith." *BOSC, Inc.*, 853 F.3d at 1177.

As noted above, questions about the making of arbitration agreements turn on state law contract formation principles. Under Oklahoma law,[4] a contract is simply "an agreement to do or not to do" something, requiring (1) parties capable of contracting; (2) those parties' consent; (3) a "lawful object"; and (4) sufficient consideration. 15 O.S. §§ 1–2; *see also Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1304 (10th Cir. 2017) (noting that contract formation under Oklahoma law requires a meeting of the minds). These principles apply with equal force to arbitration agreements. *See Jacks*, 856 F.3d at 1305 (quoting *Voss v. City of Okla. City*, 1980 OK 148, ¶ 5, 618 P.2d 925, 928) ("An agreement for the submission of an issue to arbitrators is a prerequisite to the commencement of a valid arbitration agreement."); *Shaffer v. Jeffery*, 1996 OK 47, ¶ 23, 915 P.2d 910, 917 ("A court must determine the existence of an arbitration agreement in the first instance."); *see also Boler v. Sec. Health Care, L.L.C.*, 2014 OK 80, ¶ 25, 336 P.3d 468, 477 ("Consent to arbitrate is an essential component of an enforceable arbitration agreement.").

In support of their motion to compel, Defendants have submitted the Retail Purchase Agreement, which Leslie Brown signed on the day she purchased the vehicle. *See* Doc. 7-1. Attached to this is the Agreement to Arbitrate, which also bears Ms. Brown's signature.

---

[4] The parties do not address the question of which state's law applies to the arbitration agreement. Courts typically do not raise choice of law issues *sua sponte* where the parties have acquiesced to the application of a particular state's laws. *See Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 831 n. 4 (10th Cir. 2005). Given the parties' reliance on Oklahoma law in their briefs, Plaintiffs' assertion of Oklahoma state law claims, and the fact that the vehicle sale and this lawsuit's events transpired in Oklahoma, the Court applies Oklahoma law in determining whether a contract existed.

*See* Doc. 7-2. A "Bob Moore Auto Group" logo appears in the top left corner of these documents; under "Dealership Name" on the Agreement to Arbitrate, "BMAG Luxury 1, LLC" is listed. *See* Docs. 7-1, 7-2.[5] Defendant Dabrowski also signed both agreements as the "Authorized Dealership Representative." *Id*. Thus, Defendants have produced sufficient evidence that they and Ms. Brown entered into an arbitration agreement.

In response, Plaintiffs argue that no arbitration agreement existed. *See* Doc. 9, at 2–3, 6, 8. Specifically, they contend that, while BMAG Luxury's name appears on the Agreement to Arbitrate, it does not appear on the Retail Purchase Agreement. *Id*. at 2–3. And, say Plaintiffs, because the underlying Retail Purchase Agreement was between *BMAG* and Ms. Brown, the Agreement to Arbitrate—between *BMAG Luxury* and Ms. Brown—is invalid. *See id*. at 2–3. This argument is unconvincing. Both agreements are signed by Defendant Dabrowski, an agent of "Bob Moore." *Id*. at 3; *see also* Doc. 1, at 2. Moreover, Ms. Brown specifically alleges that she "entered into a contract with *the Dealerships* to purchase" the vehicle in question. Doc. 1, at 4 (emphasis added). Faced with the Bob Moore Defendants' evidence of an arbitration agreement, Ms. Brown, as a nonmovant, must raise a genuine issue of material fact regarding the arbitration agreement's existence. Her assertions about which Defendants are listed on which documents do not call into question the existence or making of the arbitration agreement

---

[5] The Bob Moore Defendants also include a Retail Installment Sale Contract, which includes an Arbitration Provision. *See* Doc. 7-3. Leslie Brown signed this contract and its arbitration provision when she purchased the vehicle. *Id*. BMAG Luxury 1, LLC, is listed as the seller on these documents. *Id*.

11

overall. Thus, the Court finds that Ms. Brown entered into an arbitration agreement when she purchased the vehicle.[6]

Plaintiffs also deploy these same arguments, and others, to question whether BMAG and BMAG Luxury may enforce the arbitration agreement, and whether claims Leslie Brown brings on behalf of H.B. are subject to arbitration. *See* Doc. 9, at 2–5, 8. While the existence of the arbitration agreement is straightforward, the issue of non-signatories' rights and liabilities is more involved. First, Ms. Brown argues that BMAG and BMAG Luxury lack standing to compel arbitration because they are not signatories to the arbitration agreement. *See* Doc. 9, at 3. As noted above, Ms. Brown explicitly alleges that she contracted with "the Dealerships"—BMAG and BMAG Luxury—and that the Retail Purchase and Arbitration Agreements were both signed by Defendant Dabrowski, an "employee and agent" of the Dealerships. *See* Doc. 1, at 2, 4; Doc. 9, at 3. Moreover, even crediting Plaintiffs' contention that BMAG and BMAG Luxury are both non-signatories to the agreements, they are still able to compel Ms. Brown, a signatory, to arbitrate. While the "general rule is that a non-signatory to an arbitration agreement cannot compel a signatory to that agreement," an "exception to this rule . . . is where a 'signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'" *Optimum Lab. Servs. LLC v. East El Paso Physicians' Med. Ctr., LLC*, No.

---

[6] Ms. Brown, in Plaintiffs' response brief, objects that she was "coerced to agree to the Arbitration Agreement" and that "Defendants have committed fraud against the Plaintiffs." Doc. 9, at 2, 5. In certain circumstances, such allegations might speak to contract formation issues. Here, though, these contentions about coercion and fraud are too vague and conclusory to be treated as arguments questioning whether an arbitration agreement was, in fact, made.

CIV-17-411-R, 2017 WL 2656264, at *5 (W.D. Okla. June 20, 2017) (quoting *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 526–27 (5th Cir. 2000)); *see also Jacks*, 856 F.3d at 1305 (describing this exception as the "integrally-related claims" or "intertwined claims" theory and noting that, "[i]n some jurisdictions, this theory permits a nonsignatory to estop a signatory from eschewing arbitration when the claims are integrally related to a contract that contains an arbitration agreement"); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 708 (10th Cir. 2011) ("A signatory plaintiff cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." (internal quotation marks and citation omitted)); *Carter v. Schuster*, 2009 OK 94, ¶ 25, 227 P.3d 149, 156 ("[C]ircuits ha[ve] been willing to estop a signatory from avoiding arbitration with a nonsignatory where the nonsignatory was seeking to resolve issues in arbitration that were intertwined with the agreement the estopped party had signed . . . . Under such facts, the nonsignatory is agreeing to arbitrate. The signatory is merely being held to his previous agreement to arbitrate."). Plaintiffs' complaint alleges that the "causes of action arise out of a RETAIL PURCHASE AGREEMENT . . . dated . . . September 27, 2018," and that "[a]ll of the Defendants have engaged in a pattern and practice and used deceit, unlawful conduct, breach of the peace, fraud, misrepresentation[,] and conversion against the Plaintiffs . . . ." Doc. 1, at 3 (emphasis original). As Plaintiffs "group[] 'Defendants'

13

together in [their] allegations," see *Optimum Lab. Servs. LLC*, 2017 WL 2656264, at *5, BMAG and BMAG Luxury, even treated as non-signatories, may compel arbitration here.[7]

Regarding H.B., Leslie Brown's minor daughter, however, the Court agrees with Ms. Brown: H.B.'s claims are *not* subject to arbitration because H.B. is not a party to the arbitration agreement. The Tenth Circuit recently decided a case similar to this one, involving children who were non-signatories to an arbitration agreement signed by their parent-plaintiff. In *Jacks v. CMH Homes, Inc.*, Ms. Jacks brought claims individually and on behalf of her children regarding a manufactured home she purchased from defendant CMH. *Jacks*, 856 F.3d at 1303–04. CMH moved to compel arbitration; the district court granted the motion as to Ms. Jacks, but denied it as to her children because they were non-signatories to the agreement. *Id.* Affirming the district court, the Tenth Circuit held that CMH had failed to carry its burden of establishing that the non-signatory children could be held to the arbitration agreement. *Id.* at 1305.

Like CMH, Defendants here fail to establish that claims brought on behalf of H.B. by Ms. Brown are subject to arbitration. First, Defendants argue that H.B.'s claims are subject to arbitration because they arise out of the vehicle purchase agreement. *See* Doc. 10, at 5. But this argument—similar to the "intertwined claims" theory discussed above—does not govern situations, such as this one, "where . . . *signatory*-defendant[s] seek[] to

---

[7] Mr. Dabrowski's signature on the Retail Purchase Agreement and Agreement to Arbitrate arguably resolves these non-signatory issues as well under basic agency principles. As the Oklahoma Supreme Court has recognized, ,"traditional principles of agency law may bind a nonsignatory to an arbitration agreement." *Carter v. Schuster*, 2009 OK 94, ¶ 14, 227 P.3d 149, 153. But, as the parties do not address this potential theory, the Court need not delve into it, as the issue of non-signatory enforcement is resolved here under estoppel principles.

compel arbitration with a *non-signatory*-plaintiff." *Jacks*, 856 F.3d at 1305 (emphasis added) (internal quotation marks and citation omitted); *see also Carter*, 2009 OK 94, ¶ 25, 227 P.3d at 156. Second, Defendants' reliance on a "direct benefits estoppel" theory, *see* Doc. 10 at 6 n.4, under which "a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes," *Jacks*, 856 F.3d at 1306 (internal quotation marks and citation omitted), is unavailing. As the *Jacks* court made clear, Oklahoma has not adopted the direct benefits estoppel theory. *Id*. And, like the *Jacks* defendants, Defendants here "fail to cite Oklahoma law supporting their direct-benefits-estoppel theory." *Id*.[8] As federal courts are "'generally reticent to expand state law without clear guidance from its highest court,'" *id*. (quoting *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013)), the Court declines to apply this theory to the case at bar.

More to the point, Defendants' arguments miss what is the "fundamental principle" of the FAA: arbitration is a matter of contract. *See Rent-A-Center*, 561 U.S. at 67. H.B. neither signed these agreements nor participated in the actual vehicle purchase. Defendants have simply not shown that the parties to the Agreement to Arbitrate may compel H.B., a non-signatory, to arbitrate her claims. *See Jacks*, 856 F.3d at 1304 ("Defendants, as the parties seeking to compel arbitration, have the burden to show that the arbitration agreement applies to the nonsignatory plaintiffs."). Thus, because H.B. is not a party to the

---

[8] In explicating their direct benefits estoppel theory, Defendants cite *Belnap v. Iasis Healthcare*, a Tenth Circuit decision. *See* Doc. 10, at 6 n.4 (citing *Belnap*, 844 F.3d at 1294 n.17). However, *Belnap*'s analysis turns on Utah state law, not Oklahoma state law, and is, therefore, of limited value here.

arbitration agreement—and "a party cannot be required to submit to arbitration any dispute which [s]he has not agreed so to submit," *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted)—the Court will not compel claims brought on her behalf to arbitration.[9]

(B) <u>Remaining Arguments by the Parties</u>

Having found an existing arbitration agreement that the Bob Moore Defendants may enforce against claims brought by Ms. Brown in her individual capacity, but not against claims brought by Ms. Brown on behalf of H.B., the next step is to determine whether the Agreement to Arbitrate contains a delegation provision. If it does, then the Court will compel arbitration and stay proceedings unless Plaintiffs specifically challenge the enforceability of the delegation provision. *See Frazier*, 377 F. Supp. 3d at 1269 (citing *Rent-A-Center*, 561 U.S. at 72) ("When a delegation clause is present in an arbitration agreement, the party opposing arbitration must specifically dispute the validity of the delegation clause. Otherwise, the delegation clause can be severed from the arbitration provision as a whole and the arbitrator must decide arbitrability disputes."). Courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Kaplan*, 514 U.S. at 944 (brackets, internal quotation marks, and citations omitted).

---

[9] In *Jacks*, questions about the rights and liabilities of third-party beneficiaries also factor into the Tenth Circuit's analysis. *See Jacks*, 856 F.3d at 1305 ("Defendants have not cited authority, and we are not aware of any, that says a contract (here, the arbitration agreement) can be enforced against an intended third-party beneficiary who has not accepted the benefit (here, the right to compel arbitration) or otherwise sought to enforce the terms of the contract."). As the parties here do not broach the topic of third-party beneficiaries in their briefing, the Court will not do so for them.

The Agreement to Arbitrate contains the following language: "By entering into this Agreement to Arbitrate ("Agreement"), Customer(s) and Dealership . . . agree . . . to settle by binding arbitration . . . (4) *any dispute with respect to the existence, scope or validity of this Agreement*." Doc. 7-2, at 1 (emphasis added). The Court holds that this language, especially in comparison with similar provisions held to constitute delegation clauses, is clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *See, e.g., Dish Network, L.L.C.*, 900 F.3d at 1245 (concluding that the following "broad language . . . clearly and unmistakably shows the parties intended for the arbitrator to decide all issues of arbitrability": "any claim, controversy, and/or dispute . . . shall be resolved by arbitration" and "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement" (brackets, internal quotation marks, and citations omitted)); *Belnap*, 844 F.3d at 1281 (holding that the parties "clearly and unmistakably agreed to arbitrate arbitrability" by incorporating the following language: "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement . . . shall be submitted and ruled on by the Arbitrator" (emphasis, internal quotation marks, and citation omitted)); *Optimum Lab. Servs. LLC*, 2017 WL 2656264, at *3 (finding "clear and unmistakable evidence that the parties agreed to arbitrate issues of arbitrability" where the arbitration agreement contained the following language: "Any issue concerning whether or the extent to which the Dispute is subject to arbitration . . ., including issues relating to the validity or enforceability of these arbitration provisions,

shall be decided by the arbitrators" (emphasis, internal quotation marks, and citation omitted)).

Given that the parties have agreed to arbitrate arbitrability, the Court will compel arbitration unless Plaintiffs specifically attack the delegation clause. *See Rent-A-Center*, 561 U.S. at 72. Plaintiffs challenge the arbitration agreement on the following grounds: (1) the agreement is oppressive, one-sided, and discriminatory; (2) the agreement is coercive; (3) the agreement is unenforceable; (4) Plaintiffs' claims do not fall within the agreement's scope; and (5) "Defendants have committed fraud against the Plaintiffs." *See generally* Doc. 9. None of these arguments are specifically leveled against the delegation clause. Indeed, Plaintiffs never even mention "delegation." These arguments, rather, go to the Agreement to Arbitrate or the Retail Purchase Agreement generally. But "when the parties clearly and unmistakably agreed to arbitrate arbitrability"—as they have here—"all questions of arbitrability," such as questions about the agreement's scope, validity, or enforceability, "ha[ve] to be resolved by an arbitrator." *Belnap*, 844 F.3d at 1284; *see also Frazier*, 377 F. Supp. 3d at 1254–56. Thus, in light of the unchallenged delegation clause in the parties' arbitration agreement, the Court must stay proceedings and compel arbitration of Leslie Brown's individual claims. *See Rent-A-Center*, 561 U.S. at 70–72.

Finally, Defendants argue that, pursuant to the Agreement to Arbitrate, Ms. Brown has waived her right to pursue claims on behalf of a putative class. Doc. 7, at 8; *see also* Doc. 7-2, at 1 ("[T]he Parties agree that by entering into this Agreement, they are waiving . . . their right to bring or participate in any class action or multi-plaintiff action in court or through arbitration."). This argument is not addressed in Plaintiffs' response brief.

However, Ms. Brown does purport to bring claims "on behalf of other putative plaintiffs, similarly situated." Doc. 1, at 1–2 (capitalization omitted). In light of the delegation clause, the Court shall not address Defendants' argument. As the parties have delegated gateway matters of arbitrability, the arbitrator, rather than the Court, must decide the question of whether classwide arbitration is permitted. *See Dish Network L.L.C.*, 900 F.3d at 1245 ("Because we conclude below that the parties showed clear and unmistakable evidence of their intention to delegate questions of arbitrability to the arbitrator, we assume without deciding that one of these gateway matters is whether an arbitration clause authorizes class arbitration." (internal quotation marks and citation omitted)); *cf. Tiffany v. KO Huts, Inc.*, 178 F. Supp. 3d 1140, 1148 (W.D. Okla. 2016) (concluding that "the question of classwide arbitration is a gateway issue").

### IV. Conclusion

Accordingly, Defendants' Motion to Compel Arbitration (Doc. 7) is hereby GRANTED IN PART and DENIED IN PART. Those claims against the Bob Moore Defendants brought by Ms. Brown on behalf of herself are subject to arbitration and are, therefore, stayed. Claims against Defendants brought by Ms. Brown on behalf of a putative class are also stayed, as the question of whether Ms. Brown waived her right to bring such claims must be determined by the arbitrator. Finally, those claims brought by Ms. Brown on behalf of her daughter, H.B., are not subject to arbitration. Therefore, these claims, along with claims against the remaining, non-moving Defendants, shall proceed in this Court.

IT IS SO ORDERED this 22nd day of August, 2019.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE